[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10699

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 8, 2012
JOHN LEY
CLERK

D.C. Docket No. 6:08-cv-01024-JA-DAB

CARL ROBERT ALVAREZ,

                                        Plaintiff - Appellant,

versus

ATTORNEY GENERAL FOR THE STATE OF FLORIDA,
STATE ATTORNEY FOR THE EIGHTEENTH
JUDICIAL CIRCUIT OF FLORIDA,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 8, 2012)

Before MARCUS, COX and SILER,[*] Circuit Judges.

MARCUS, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

Carl Robert Alvarez appeals from a district court order dismissing his §1983 civil rights action against the Attorney General of Florida and the State Attorney for Florida's Eighteenth Judicial Circuit. In 1991, Alvarez was convicted in Florida of first-degree murder, sexual battery, and aggravated child abuse. He was sentenced to life imprisonment. In state postconviction proceedings, Alvarez sought to obtain, pursuant to Florida's postconviction DNA access procedures, some of the physical evidence collected by the State in order to conduct DNA testing. The state trial court denied the petition, and Florida's Fifth District Court of Appeal affirmed, Alvarez v. State, 951 So. 2d 852 (Fla. 5th Dist. Ct. App. 2007) (Table).

In his federal complaint, Alvarez claims that the State prevented him from gaining access to physical evidence for purposes of DNA testing, in violation of his procedural due process rights under the Fourteenth Amendment, the Eighth Amendment's prohibition against cruel and unusual punishment, his Sixth Amendment right to confrontation and compulsory process, and his Fourteenth Amendment right of access to the courts. The district court dismissed all of the claims for failure to state a claim or for lack of subject-matter jurisdiction.

After thorough review, we affirm. The Supreme Court has recently made it abundantly clear that there is no freestanding constitutional right to access

2

evidence for DNA testing, and that the federal courts may only upset a state's postconviction DNA access procedures if they are fundamentally inadequate to vindicate substantive rights.  Alvarez has made no showing that Florida's postconviction DNA access procedures are unconstitutional on their face.  Indeed, at oral argument, Alvarez's counsel explicitly abandoned any facial challenge to the constitutionality of Florida's access procedures.  Alvarez also attacks the state courts' application of these procedures to the facts of his case, but the district court correctly determined that it lacked jurisdiction to entertain the claim under the Rooker-Feldman doctrine.  His remaining claims attempt in various ways to assert a freestanding constitutional right to obtain evidence for DNA testing; they are squarely foreclosed by case precedent.

**I.**

Because this case was decided on a motion to dismiss, we take the facts from Alvarez's complaint and the attached exhibits as true.  Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam) ("When considering a motion to dismiss, all facts set forth in the plaintiff's complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto." (internal quotation marks omitted)).

These are the essential facts and procedural history.  In 1991, Alvarez was

convicted in the Eighteenth Judicial Circuit Court for Seminole County, Florida, of first degree murder, sexual battery, and aggravated child abuse of his stepson, Joshua Boynton, who was seven years old. On the evening of December 5, 1989, Alvarez made a 911 phone call reporting that his stepson was unconscious. Boynton was still unconscious when the paramedics arrived about four minutes later. Boynton never regained consciousness, however, and was determined to be brain dead the following day. His life support systems were removed on December 7, 1989. Boynton had sustained injuries to the left side of his face, left ear, both eyes, the left side of the head, and the inside parts of his thighs and buttocks.

Alvarez claims that no physical evidence linked him to the crime and that his conviction was based wholly upon his pre-trial statements denying responsibility for the crimes. In fact, the State's medical evidence contradicted Alvarez's pre-trial statements. Thus, for example, the State's medical evidence established that the Boynton's injuries were not consistent with the victim falling from a couch -- the explanation initially offered by Alvarez to paramedics. The medical testimony further provided that the condition of Boynton's anus was consistent with it having been penetrated by a blunt object or finger. The defense's theory at trial was no longer that Boynton had fallen from a couch, but

rather that Boynton's injuries were inflicted by someone other than Alvarez and that it was possible that a third party may have injured Boynton while Alvarez was asleep that night or when Boynton was at a neighbor's house or with his mother earlier in the day.

During the investigation of Alvarez, the State collected the following pieces of physical evidence: Joshua Boynton's pajama top on which a small amount of blood was found; Joshua Boynton's pajama bottom and jeans; Joshua Boynton's sweatshirt; a pair of men's sweatpants; a men's white Hard Rock Cafe sweatshirt and Joshua Boynton's belt; a vomit-soaked towel; a pair of men's pajamas; one towel; a pair of blue jeans; and one pair of sweatpants. Alvarez claims that none of this physical evidence was submitted for DNA testing at the time of his criminal trial in 1990, observing that "[s]ophisticated DNA tests were not then generally available."

Alvarez also says that in 1990 the blood found on Boynton's pajama top was insufficient to allow for DNA testing, but "DNA testing can now be performed on even a single cell and even on degraded evidence." Alvarez proposes to perform DNA testing on each of the aforementioned pieces of evidence at his own expense, and thus seeks access for that reason. He also posits that the physical evidence has been preserved and is in the possession of either the

5

Seminole County Sheriff's Office or Clerk of Court.

Following his conviction, Alvarez collaterally filed in state court a "Petition for Post-Sentencing DNA Testing," pursuant to Fla. R. Crim. P. 3.853 and Fla. Stat. § 925.11. Fla. R. Crim. P. 3.853 specifically governs the procedures in Florida for obtaining postconviction DNA testing. It requires the trial court to answer three questions when ruling on the access motion:

(A) Whether it has been shown that physical evidence that may contain DNA still exists.

(B) Whether the results of DNA testing of that physical evidence likely would be admissible at trial and whether there exists reliable proof to establish that the evidence containing the tested DNA is authentic and would be admissible at a future hearing.

(C) Whether there is a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if the DNA evidence had been admitted at trial.

Fla. R. Crim. P. 3.853(c)(5). Fla. Stat. § 925.11 also addresses postsentencing DNA testing and similarly requires the trial court to answer the same three questions. Fla. Stat. § 925.11(2)(f).

After several rounds of amendation, Alvarez filed a "Third Amended Petition for Post-Conviction DNA Testing" in state court, maintaining his innocence and seeking access to the physical evidence for DNA testing. He

6

claimed this would exonerate him because the resulting tests would establish the identity of the real perpetrator of these crimes. Alvarez theorized that the victim's injuries were sustained as a result of violent conduct, so there would be a reasonable possibility that bodily fluids would have been left behind on the physical evidence, including the blood found on the victim's pajama top.

The state court conducted a hearing on the petition in June 2006 pursuant to Florida's now-decade-old DNA access procedures. Ultimately, the court denied the third amended petition in a brief order. It found that Alvarez had "failed to meet the first and third prongs" of the rule's three-part test. As for the first prong, the court found that because the injury to the victim was allegedly "caused by some blunt object, but not a penis," there was a strong likelihood that no DNA evidence relating to the victim's injuries existed on the items in evidence. And as for the third prong, the court found that Alvarez's theory of innocence was simply "I didn't do it," and that Alvarez failed to adequately explain how DNA testing would exonerate him, resulting in an acquittal or lesser sentence. The state trial court's order was summarily affirmed per curiam by Florida's Fifth District Court of Appeal. Alvarez, 951 So. 2d at 852.

Alvarez then filed the instant civil rights action in the United States District Court for the Middle District of Florida pursuant to 42 U.S.C. § 1983. The State

7

moved to dismiss, and after the United States Supreme Court decided <u>District Attorney's Office for the Third Judicial District v. Osborne</u>, 129 S. Ct. 2308 (2009), the district court granted the motion and dismissed all of Alvarez's claims.

This timely appeal followed.

## II.

We review <u>de novo</u> the grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. <u>Thompson v. RelationServe Media, Inc.</u>, 610 F.3d 628, 633 (11th Cir. 2010). Like the district court, we are required to accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. <u>Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention</u>, 623 F.3d 1371, 1379 (11th Cir. 2010). The district court also based its dismissal in part on the absence of subject-matter jurisdiction pursuant to Fed. R. Civ. P 12(b)(1); we review that question of law <u>de novo</u> as well. <u>Sinaltrainal v. Coca-Cola Co.</u>, 578 F.3d 1252, 1260 (11th Cir. 2009).

The Supreme Court's recent decision in <u>Osborne</u> controls the resolution of many of the issues raised on appeal, so we explicate it at some length. <u>Osborne</u> involved an Alaska prisoner convicted by an Alaska jury of kidnaping, assault, and sexual assault. 129 S. Ct. at 2314. Osborne later filed a § 1983 suit in federal

8

district court seeking access to crime scene evidence for DNA testing. Id. at 2315. Osborne claimed that the Due Process Clause and other constitutional provisions afforded him a constitutional right to access the DNA evidence. Id. The district court granted summary judgment in favor of Osborne, and the Ninth Circuit affirmed, generally finding a due process right to access DNA evidence in postconviction proceedings analogous to the right to be provided with exculpatory evidence prior to trial under Brady v. Maryland, 373 U.S. 83 (1963). Osborne, 129 S. Ct. at 2315.

The Supreme Court reversed, rejecting the attempt to constitutionalize the issue of postconviction access to DNA evidence. The Court reasoned instead that the task of "harness[ing] DNA's power to prove innocence" within the existing criminal justice framework "belongs primarily to the legislature." Id. at 2316. Of course, the legislative procedures for postconviction access to DNA evidence still must be consonant with the requirements of due process; thus, the Supreme Court observed that Osborne had "a liberty interest in demonstrating his innocence with new evidence under state law." Id. at 2319. But it squarely rejected the Ninth Circuit's extension of the Brady right to exculpatory evidence in this context. Id. at 2319-20. The Court reasoned that "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man," and that

9

"Osborne's right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." Id. at 2320.

After again rejecting Brady as the wrong framework, the Supreme Court posed the operative question this way: "whether consideration of Osborne's claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." Id. (internal quotation marks omitted). Ultimately, the Supreme Court concluded that there was "nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence." Id.

The Supreme Court also rejected Osborne's attempt to defend the Ninth Circuit's opinion on substantive due process grounds. The Court flatly held that "there is no such substantive due process right." Id. at 2322; see also Skinner v. Switzer, 131 S. Ct. 1289, 1299 (2011) ("Osborne has rejected substantive due process as a basis for [DNA testing] claims."). Noting its general reluctance to expand the concept of substantive due process, Osborne, 129 S. Ct. at 2322 (citing

Collins v. Harker Heights, 503 U.S. 115, 125 (1992)), the Court further observed

that in the context of DNA testing, "[t]here is no long history of such a right, and

the mere novelty of such a claim is reason enough to doubt that substantive due

process sustains it," id. (internal quotation marks and alteration omitted).  Finally,

the Court noted that "[t]he elected governments of the States are actively

confronting the challenges DNA technology poses to our criminal justice systems

and our traditional notions of finality."  Id.  The Court reasoned that "[t]o suddenly

constitutionalize this area would short-circuit what looks to be a prompt and

considered legislative response."  Id.  The Court concluded that it was "reluctant

to enlist the Federal Judiciary in creating a new constitutional code of rules for

handling DNA."  Id.

With Osborne in mind, we turn to Alvarez's claims.

**A.**

Alvarez's first and primary assertion was that Florida's DNA access

procedures fail to meet the requirements of procedural due process.  As briefed,

the claim challenged the constitutionality of Florida's procedures both facially and

as-applied to his case.  At oral argument, however, Alvarez's counsel expressly

abandoned any challenge to the facial constitutionality of Florida's procedures,

leaving only an as-applied challenge.  Thus, Alvarez now argues only that the

11

Florida courts erroneously applied and interpreted Florida's concededly constitutional procedures in deciding his case. The problem with the argument is, as the district court properly determined, that the district court lacked jurisdiction over this claim under the Rooker-Feldman doctrine.

The Rooker-Feldman doctrine derives from Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). The doctrine is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments. Nicholson v. Shafe, 558 F.3d 1266, 1270 (11th Cir. 2009). This is because "[28 U.S.C.] § 1257,[1] as long interpreted, vests authority to review a state court judgment solely in th[e Supreme] Court." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 292 (2005). The Supreme Court recently has cautioned that "[t]he Rooker-Feldman doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284; see also Lance v. Dennis, 546 U.S. 459, 464 (2006) (per curiam)

---

[1] Title 28 U.S.C. § 1257 provides in relevant part that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari" if they involve an issue of federal law. 28 U.S.C. § 1257(a).

12

(noting the "narrowness" of the Rooker-Feldman rule).  We have since explained that the Rooker-Feldman doctrine operates as a bar to federal court jurisdiction where the issue before the federal court was "inextricably intertwined" with the state court judgment so that (1) the success of the federal claim would "effectively nullify" the state court judgment, or that (2) the federal claim would succeed "only to the extent that the state court wrongly decided the issues."  Casale v. Tillman, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam) (internal quotation marks omitted).

Fully aware that Rooker-Feldman is a narrow jurisdictional doctrine, we nonetheless hold that Alvarez's challenge to the Florida courts' resolution of his petition is squarely within its orbit.  Although this Circuit has yet to consider the applicability of the Rooker-Feldman doctrine in the context of a § 1983 suit challenging a state's failure to produce evidence for DNA testing, the district court relied upon decisions from two of our sister circuits, which have held that the Rooker-Feldman doctrine bars challenges nearly identical to the one raised here.  See McKithen v. Brown, 626 F.3d 143, 154-55 (2d Cir. 2010) (holding that the Rooker-Feldman doctrine barred the claim that "the state court incorrectly and unconstitutionally interpreted the [New York DNA] statute by not assuming exculpatory results," and noting that "[t]he proper vehicle for McKithen to

13

challenge the state court's interpretation of [the statute] was an appeal to the New York Appellate Division"); In re Smith, 349 F. App'x 12, 15 (6th Cir. 2009) ("[B]y complaining that the [Michigan] state trial court wrongfully denied him the DNA evidence because rejection of his petition was improper -- but not complaining that the statute itself is flawed -- Smith is 'complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment,' which is clearly barred by Rooker-Feldman." (quoting Exxon Mobil, 544 U.S. at 291)).

Alvarez similarly seeks review and rejection of the state court judgment in this case. See Exxon Mobil, 544 U.S. at 291. His as-applied procedural due process claim plainly and broadly attacks the state court's application of Florida's DNA access procedures to the facts of his case; notably, it does not challenge the constitutionality of those underlying procedures. Alvarez claims that in denying his petition for DNA testing, "the State court arbitrarily ignored material facts showing a 'reasonable probability' that Mr. Alvarez would have been acquitted," and that the state court made erroneous findings of fact concerning his petition.

Alvarez's claim is thus unlike the claim before the Supreme Court in Skinner v. Switzer, 131 S. Ct. 1289 (2011), where the Court held that the Rooker-Feldman doctrine did not bar a claim that Texas's DNA access statute, as

14

authoritatively construed by the Texas courts, was unconstitutional. Id. at 1297-98. On this point, Skinner stands for the unremarkable proposition that the existence of a state court judgment interpreting or relying upon a statute does not bar a federal court from entertaining an independent challenge to the constitutionality of that statute. Id. at 1298 ("[A] state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action. Skinner's federal case falls within the latter category."). Again, Alvarez has abandoned any such broad challenge to the constitutionality of Florida's DNA access procedures in this case, and our holding that the Rooker-Feldman doctrine bars his procedural due process attack on the state court judgment is wholly consonant with the Supreme Court's reasoning in Skinner.

Alvarez's as-applied procedural due process challenge boils down to a claim that the state court judgment itself caused him constitutional injury by arbitrarily denying him access to the physical evidence he seeks under Florida's concededly constitutional procedures. It is abundantly clear that success on this claim would "effectively nullify" the state court's judgment and that the claim would succeed "only to the extent that the state court wrongly decided the issues." Casale, 558 F.3d at 1260 (internal quotation marks omitted). Simply put, Alvarez's claim

15

meets all of the criteria for application of the Rooker-Feldman doctrine as they have been recently articulated by the Supreme Court in Exxon Mobil: undeniably, it is part of a "case brought by [a] state-court loser[]"; unambiguously, it "complain[s] of injuries caused by [the] state-court judgment[]," namely the arbitrary and erroneous application of Florida's DNA access procedures; clearly, the state court judgment was "rendered before the district court proceedings commenced"; and, finally, Alvarez's claim "invit[es] district court review and rejection" of the state court judgment. 544 U.S. at 284; see also Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1330 (11th Cir. 2010) ("The [Rooker-Feldman] doctrine bars the losing party in state court 'from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'" (emphasis added) (quoting Johnson v. De Grandy, 512 U.S. 997, 1005-06 (1994))).

The district court did not err in determining that, to the extent Alvarez has alleged a violation of procedural due process because of the way the Florida state courts applied Florida's DNA access procedures to the facts of his case, Rooker-Feldman barred the court from exercising subject-matter jurisdiction over the claim.

**B.**

Alvarez's second argument is styled as an actual innocence claim based on the Due Process Clause. Alvarez says that the State's "refusal to allow the release of biological evidence for DNA testing . . . deprived him of the opportunity to make a conclusive showing that he is innocent of the crimes for which he is currently incarcerated although he is, in fact, innocent." He relies on Herrera v. Collins, 506 U.S. 390 (1993), where the Supreme Court "assume[d], for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," id. at 417 (emphasis added).

To the extent Alvarez has thereby raised a substantive due process right to obtain biological evidence for DNA testing, in order "to make a conclusive showing that he is innocent," the claim is without merit, because the Supreme Court in Osborne unambiguously concluded that there is no substantive due process postconviction right to obtain evidence for DNA testing purposes. 129 S. Ct. at 2322-23.

Moreover, as the Supreme Court noted in Osborne in reference to the petitioner's "oblique[]" reliance "on an asserted federal constitutional right to be

17

released upon proof of 'actual innocence,'" 129 S. Ct. at 2321, this kind of claim "would be brought in habeas," id. at 2322. In Osborne, the Court assumed without deciding that such a constitutional right exists, "because even if so there [was] no due process problem" under federal habeas and discovery procedures. Id. at 2321-22 (citing 28 U.S.C. § 2254 Rule 6; Bracy v. Gramley, 520 U.S. 899, 908-09 (1997)). But Alvarez, like Osborne, has not sought habeas relief based on a freestanding actual innocence claim, nor has he shown (or, for that matter, even argued) that the available discovery in a habeas proceeding is facially inadequate or that it somehow would be arbitrarily denied to him. See id.

Further, in this Circuit we have already ruled that Osborne foreclosed Herrera-based actual innocence claims of the sort made here. See Cunningham v. Dist. Attorney's Office, 592 F.3d 1237, 1255 (11th Cir. 2010) ("After the Court issued its decision [in Osborne], we asked the parties for supplemental briefing to address Osborne's impact on this appeal. In response, Cunningham conceded that his Brady, substantive due process, Herrera-based actual innocence, and clemency-related claims did not survive the Osborne decision. We agree with those concessions." (emphases added)); id. at 1272 ("[T]he Supreme Court has made clear that Herrera is not a basis for obtaining DNA testing in a § 1983 action . . . ."). Nor, finally, is Cunningham distinguishable from this case. On the

18

contrary, the circumstances confronted by the panel in <u>Cunningham</u> were nearly identical to those we face here. <u>Cunningham</u> similarly involved a prisoner serving a life sentence seeking access to biological evidence for DNA testing under § 1983 in the "<u>hope</u>[] that the results will show that he is innocent." <u>Id.</u> at 1241 (emphasis added).

## C.

Alvarez also makes two cursory, one-paragraph arguments that seek to constitutionalize a right to access evidence for DNA testing under the Eighth and Sixth Amendments. Thus, Alvarez claims that it is cruel and unusual punishment to subject him to a sentence of life imprisonment if there is evidence that might exonerate him. Alvarez also claims that he is entitled to access the evidence for DNA testing under the Sixth Amendment because he "has a right to the government's assistance in securing favorable witnesses at trial and to put forward evidence that might influence the determination of guilt or innocence."

These claims likewise are without merit under <u>Osborne</u>. One of the main reasons underlying the decision in <u>Osborne</u> is that it should be primarily up to the state and federal <u>legislatures</u> to fashion procedures that balance the powerful exonerating potential of DNA evidence with the need for maintaining the existing criminal justice framework and the finality of convictions and sentences. <u>See</u>

19

Osborne, 129 S. Ct. at 2316-17, 2322-23. For us to sweep aside Florida's established procedures and constitutionalize a right to access evidence for DNA testing under the Sixth or Eighth Amendments would squarely conflict with the Supreme Court's explicit rejection of an invitation "[t]o suddenly constitutionalize this area." Id. at 2322; see also id. ("We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA."). We can discern no conceivable basis in this case, nor has Alvarez provided us with one, for attempting an end-run around the Osborne holding under the cloak of the Sixth or Eighth Amendments.

**D.**

Finally, Alvarez argues that the State, by denying him access to the physical evidence, has effectively deprived him of the opportunity to litigate his claim, in violation of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments. This claim is also foreclosed by Supreme Court and Circuit precedent. "'It is now established beyond a doubt that prisoners have a constitutional right of access to the courts' under the Due Process Clause." Cunningham, 592 F.3d at 1271 (quoting Bounds v. Smith, 430 U.S. 817, 821 (1977)). But in order to establish a violation of that right, "a prisoner must show an actual injury." Id. (citing Lewis v. Casey, 518 U.S. 343, 349 (1996)). This

20

requirement "derives ultimately from the doctrine of standing," Casey, 518 U.S. at 349, and "reflects the fact that the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong," Cunningham, 592 F.3d at 1271 (internal quotation marks omitted). Accordingly, "a litigant asserting an access claim must also prove that he has a colorable underlying claim for which he seeks relief." Barbour v. Haley, 471 F.3d 1222, 1226 (11th Cir. 2006).

Alvarez has pointed us to no underlying cause of action that he was prevented from lodging in a court of law. Alvarez can hardly claim that he was denied the opportunity to present a substantive due process claim, a Sixth Amendment claim, or an Eighth Amendment claim to a court when he has no such colorable claims in the first place. Barbour, 471 F.3d at 1226; cf. Cunningham, 592 F.3d at 1272 ("Because we have concluded that Alabama's mechanism for postconviction relief is consistent with due process under Osborne's fundamental fairness standard, it follows that it does not improperly interfere with Cunningham's right of access to the courts."). Thus, he has failed to establish in support of his access to courts claim the necessary prerequisite of an "actual

injury." <u>Cunningham</u>, 592 F.3d at 1271.[2]

[2] Again, Alvarez has abandoned as a direct claim any procedural due process challenge to the facial constitutionality of Florida's DNA access procedures. But to the extent his alternative claim that he was denied access to the courts turns on an underlying cause of action alleging that Florida's procedures fail to meet the requirements of procedural due process, we are still hard-pressed to find that Alvarez has established an actual injury. Florida's procedures are in many ways more favorable to a petitioner seeking DNA access than the Alaska or federal statutes, <u>see generally</u> Alaska Stat. § 12.72.010 <u>et seq.</u>; 18 U.S.C. § 3600 -- both of which the Supreme Court endorsed in <u>Osborne</u>. <u>Osborne</u>, 129 S. Ct. at 2316-17 (noting that "the federal statute is a model for how States ought to handle the issue" of postconviction DNA testing); <u>id.</u> at 2320 (holding that there was "nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence"); <u>see also</u> <u>Cunningham</u>, 592 F.3d at 1263 ("<u>Osborne</u> . . . invites . . . a comparative approach, describing key elements of Alaska's process as both 'similar' to other state and federal statutes and also 'not inconsistent' with fundamental fairness.").

Thus, for example, unlike the Alaska and federal statutes at issue in <u>Osborne</u>, Florida's procedures explicitly provide for the possibility of a hearing on a motion to obtain DNA testing. Fla. R. Crim. P. 3.853(c)(3) ("Upon receipt of the response of the prosecuting authority, the court shall review the response and enter an order on the merits of the motion or set the motion for hearing."). Also unlike the Alaska and federal statutes, Florida explicitly provides for the right to appeal an adverse decision on the motion, Fla. R. Crim. P. 3.853(f), as well as the possibility of a rehearing in the trial court, Fla. R. Crim. P. 3.853(e). In addition, unlike the federal statute, Rule 3.853 does not require that the applicant's identity be a disputed issue at trial, allowing instead for the additional possibility that the DNA evidence will only mitigate his sentence. Rule 3.853 requires that the motion contain <u>either</u> "a statement that identification of the movant is a genuinely disputed issue in the case and why it is an issue <u>or</u> an explanation of how the DNA evidence would <u>either</u> exonerate the defendant <u>or</u> mitigate the sentence that the movant received." Fla. R. Crim. P. 3.853(b)(4) (emphases added). The federal statute, however, is not phrased in the disjunctive but rather definitively requires the court to find that, "[i]f the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial." 18 U.S.C. § 3600(a)(7). Also unlike the federal statute, Rule 3.853 sets a definitive limit on the time period within which the government must respond to a motion seeking postconviction DNA testing. Rule 3.853 provides that, if the court finds the motion to be facially sufficient, "the prosecuting authority shall be ordered to respond to the motion within 30 days or such other time as may be ordered by the court." Fla. R. Crim. P. 3.853(c)(2). The federal statute, on the other hand, more vaguely provides that, upon receipt of the applicant's motion, the court shall "allow the Government a reasonable time period to respond to the motion." 18 U.S.C. § 3600(b)(1)(B). Finally, unlike the federal statute, Rule 3.853 places no time limit on when a motion for postconviction DNA testing can be filed. Specifically, Rule 3.853 provides that "[t]he motion for postconviction DNA testing may be filed or considered at <u>any time</u> following the date that the

Moreover, the State's "out-of-court refusal to release evidence for DNA testing in no way prevent[ed Alvarez] from asking a state court to order release of that evidence." Id. at 1272. Indeed, that is precisely what Alvarez did in this case -- he sought release of the evidence from the state court, and the state court denied his request. Under these circumstances, Alvarez cannot raise a colorable claim that he was deprived of access to the courts by the State's actions; the district court properly dismissed this claim too.

---

judgment and sentence in the case becomes final." Fla. R. Crim. P. 3.853(d) (emphasis added). The federal statute, on the other hand, does not set a firm deadline but requires that the motion for postconviction DNA testing be made in a "timely fashion." 18 U.S.C. § 3600(a)(10).

In other respects, Florida's procedures mirror the federal statute in the protections afforded applicants. Both provide, for example, that the government must bear the costs of DNA testing if the applicant is indigent. 18 U.S.C. § 3600(c)(3)(B); Fla. R. Crim. P. 3.853(c)(6). Similarly, both provide that a court may appoint counsel to represent an indigent applicant. 18 U.S.C. § 3600(b)(3); Fla. R. Crim. P. 3.853(c)(4). And like the federal statute, Rule 3.853 places limits on who can conduct the actual DNA testing in order to ensure the reliability of the process and the results. Specifically, Rule 3.853 provides that the DNA testing must be conducted by the Florida Department of Law Enforcement or its designee. Fla. R. Crim. P. 3.853(c)(7). Upon a showing of good cause, however, the court may order that the testing be done by another certified laboratory or agency, if requested by a movant who can bear the cost of such testing. Id. The federal statute similarly provides that the DNA testing must be carried out by the Federal Bureau of Investigation. 18 U.S.C. § 3600(c)(1). If, however, "the court makes all the necessary orders to ensure the integrity of the specific evidence and the reliability of the testing process and test results," "the court may order DNA testing by another qualified laboratory." Id. § 3600(c)(2).

In short, inasmuch as Florida's postconviction DNA access procedures either mirror or are more applicant-friendly than the Alaska and federal statutes endorsed in Osborne, Florida's postconviction DNA access procedures plainly do not offend any principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, nor do they transgress any recognized principle of fundamental fairness in operation. See Osborne, 129 S. Ct. at 2320; cf. Cunningham, 592 F.3d at 1263 ("Alabama's procedures pass [constitutional] muster if they compare favorably with Alaska's.").

23

**AFFIRMED.**